**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| HARRY PENNINGTON III and TIMOTHY LORENTZ, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FLUOR CORPORATION, FLUOR ENTERPRISES, INC., FLOUR DANIEL MAINTENANCE SERVICES, INC., SCANA CORPORATION, and SOUTH CAROLINA ELECTRIC & GAS COMPANY, <br><br> Defendants. | CASE NO. 0:17-02094-JMC |

**AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF WARN ACT, 29 U.S.C. § 2101, *ET SEQ.*

Plaintiffs Harry Pennington III and Timothy Lorentz ("Plaintiffs") allege on behalf of themselves and subclasses of similarly situated former employees of Defendants Fluor Corporation, Fluor Enterprises, Inc., and Fluor Daniel Maintenance Services, Inc. (together, "Fluor") and of non-defendant Westinghouse Electric Company LLC and its subsidiaries ("WEC" or "Westinghouse"), against Fluor and Defendants SCANA Corporation and its subsidiary, South Carolina Electric & Gas Company (together, "SCANA" or the "SCANA Defendants"), as follows:

## NATURE OF THE ACTION

1.     Plaintiff Pennington was an employee of Defendants Fluor and SCANA for purposes of the WARN Act until his termination along with approximately 5,000 other similarly situated employees on or about July 31, 2017.

2.     Plaintiff Lorentz was an employee of non-defendant WEC and the SCANA Defendants for purposes of the WARN Act until his termination along with approximately 600 other similarly situated employees on or about July 31, 2017.

3.     Plaintiffs did not receive any advance written notice of their termination.

4.     Plaintiffs bring this action on behalf of themselves, and the other similarly situated former employees of SCANA who worked at, reported to, or received assignments from the Virgil C. Summer Nuclear Generating Station ("VC Summer" or the "Facility"), located at Highway 215 & Bradham Blvd., Jenkinsville, South Carolina 29065, who were terminated without cause, as part of, or as the foreseeable result of, plant closings or mass layoffs ordered by Defendants on or around July 31, 2017, and who were not provided 60 days advance written notice of their terminations by SCANA or their immediate employers Fluor and WEC, as required by the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq*.

5.     The WARN Act provides that two or more independent contracting companies may be held jointly and severally liable as a "single employer," and also provides that parents and subsidiaries may be held jointly and severally liable as a "single employer". 20 C.F.R. § 639.3(a)(2).

6.     Fluor and its subsidiaries were a single employer of the persons they employed at VC Summer, and together with the SCANA Defendants, a single employer of those employees.

7.      Non-defendants WEC and its subsidiaries were a single employer of the persons they employed at VC Summer, and together with the SCANA Defendants, a single employer of those employees.

8.      Both Plaintiffs and all similarly situated employees seek to recover 60 days wages and benefits pursuant to the WARN Act from SCANA, and Plaintiff Pennington seeks such recovery jointly and severally against Fluor.

9.      Plaintiff Pennington filed the original Complaint in this action on August 8, 2017.

10.     At least one action has been filed under the WARN Act on behalf of employees of debtors WEC and its subsidiaries based on the July 31, 2017 VC Summer terminations in the United States Bankruptcy Court of the Southern District of New York.  (*Fleetwood. et al., v. WECTEC, LLC. et al.*, 17-ap-01110-MEW)(Bankr. S.D.N.Y).

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

12.     Venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5) and 28 U.S.C. § 1391.

13.     Assignment in the Rock Hill Division is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in Jenkinsville, South Carolina, which is in Fairfield County.

## THE PARTIES

### *Plaintiffs*

14.     Plaintiff Harry Pennington III worked as a Heavy Equipment Operator at VC Summer until his termination on or about July 31, 2017.  His immediate employer was Fluor Daniel Maintenance Services, Inc.

15.     Plaintiff Timothy Lorenz worked as a Project Manager.  His immediate employer was Westinghouse Electric Company LLC.

### *Defendants*

16.     Defendant Fluor Corporation is a Delaware corporation with its principal place of business located at 6700 Las Colinas Boulevard, Irving, Texas 75039.

17.     Defendant Fluor Enterprises, Inc. is a California corporation with its principal place of business located at 3 Polaris Way, Aliso Viejo, California 92698.

18.     Defendant Fluor Daniel Maintenance Services, Inc. is a Delaware corporation with its principal place of business located at 6700 Las Colinas Boulevard, Irving, Texas 75039.

19.     Upon information and belief, Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. are subsidiaries of Fluor Corporation.

20.     Defendant SCANA Corporation is a South Carolina corporation with its principal place of business located at 100 SCANA Parkway, Cayce, South Carolina 29033.

21.     South Carolina Electric & Gas Company ("SCE&G") is a regulated public utility wholly-owned by SCANA Corporation engaged in the generation, transmission, distribution and sale of electricity, primarily in South Carolina.

22.     SCE&G is incorporated in South Carolina and maintains its principal executive offices at 220 Operation Way, Cayce, South Carolina 29033-3701.

4

23.     On or about July 31, 2017, SCANA together with Fluor terminated without notice the employment of approximately 5,000 employees, including the Plaintiff Pennington, and SCANA together with non-defendant WEC, terminated the employment of approximately 600 employees , including the Plaintiff Lorentz.

## SUBSTANTIVE ALLEGATIONS

24.     Defendant SCANA, an energy-based holding company and its principal subsidiary, South Carolina Electric & Gas Company, are engaged in the generation, transmission, distribution and sale of electricity, primarily in South Carolina.

25.     SCANA petitioned the South Carolina state legislature in 2007 for permission to proceed at the existing V.C. Summer Nuclear Station with a multi-billion dollar two-reactor expansion (the "Summer Project").  Defendants would be 60% owners of the Summer Project, and South Carolina Public Service Authority (Santee Cooper), a state agency (together with SCANA, the "Owners"), would be the 40% owner .

26.     The Summer Project was initially expected to cost about $9 billion.  But by 2017, delays and cost overruns had driven up the cost estimates to $20 billion or more.

27.     A major reason that state regulators and utility staffers went ahead with the SCANA Summer Project was that state lawmakers had passed the Base Load Review Act (the "BLRA") in 2007, which provided huge incentives to build large-scale power plants.

28.     The BLRA demanded only limited accountability from the utility company builders themselves.  The BLRA put the risk for the Summer Project onto electric customers by ensuring that the utility could recoup its costs.  As is customary in massive projects, it was assumed rate-payers could and should absorb all costs because they would be compensated by cheaper power over a 50-70 year period.  The BLRA, however, imposed costs on the electric rate-payers even if the project was cancelled.

29.     When SCANA terminated the project in July 2017, it indeed proposed to charge its losses to electric rate-payers (who were already paying on average an extra $27 a month for the reactors) for the next 60 years pursuant to the BLRA.

30.     When SCANA applied to build the reactors in 2007, it used a generic schedule that was non-specific and inadequate to reflect the construction time and costs necessary to complete the Summer Project.  SCANA knew its schedule was not legitimate.

31.     In 2008, SCANA Corporation, for itself and as agent for Santee Cooper, entered into an agreement with a consortium (the "Consortium") comprising WEC and Chicago Bridge & Iron Company ("CB&I")—the owner of Stone & Webster ("S&W").  The parties entered into an *Engineering, Procurement, and Construction Agreement* in May 2008 (the "EPC Agreement") under which the Consortium would build the Summer Project, featuring two AP-1000 nuclear reactors known as VC Summer 2 and 3.

32.     The Summer Project, along with a comparable agreement to build similar reactors in Georgia, represented the first new nuclear power plant construction in the U.S. in 30 years.

33.     Under the EPC Agreement, the Consortium had to substantially complete the first VC Summer 2 by April 1, 2016 and VC Summer 3 by January 1, 2019.

34.    Under the EPC Agreement, WEC was generally responsible for the design, manufacture, and procurement of the nuclear reactor, steam turbines, and generators, while S&W was responsible for on-site construction and procurement of auxiliary equipment.

35.    As delays and cost overruns mounted, disputes arose between SCANA and the Consortium members regarding the pace of the projects and which parties bore the ultimate responsibility for cost increases.  The Owners and the Consortium members alleged claims against each other and commenced litigation to resolve the apportionment of increased costs.

36.    In or around 2015, WEC sought to resolve existing and potential litigation by acquiring CB&I and S&W.

37.    Although WEC remained the primary contractor to SCANA, a new subcontractor was appointed to WEC, Fluor Corporation, a U.S.-based global engineering and construction company.  Fluor would provide staffing for craft (manual labor) employees and would take primary responsibility for on-site construction while WEC focused on engineering and project management.  WEC transferred to Fluor many of the S&W craft employees it had acquired.

38.    Fluor took responsibility for the craft, field engineers, and project controls personnel including the costs and scheduling of personnel.

39.    In acquiring S&W, Westinghouse generally accepted liability for the cost overruns on the Summer Project, by agreeing to build it for a "fixed-price" at SCANA's option.

40.    In May 2016, SCANA exercised that option, ostensibly capping the Owners' costs for the Summer Project at close to $14 billion.

41.    In December 2016, Westinghouse and Fluor were concluding work on an Estimate to Complete report ("ETC") pursuant to the EPC agreement.  The ETC would forecast the actual number of hours and costs required to complete the Summer Project.  The ETC was not formally circulated as it was being audited and verified in early 2017 but upon information and belief, its results were known by the parties.

42.    Upon information and belief, the ETC forecast that an additional $6.1 billion beyond the $14 billion fixed price estimate would be necessary to complete the Summer Project (for which WEC would be liable).  That amount would comprise $3.7 billion in additional labor costs; $1.8 billion in additional equipment prices and vendor costs; and $600 million in additional risk and contingency planning—including warranty and fee claims.  It would also take at least three more years to complete.

43.    Learning of this, WEC's parent Toshiba and WEC determined WEC could not sustain these costs under the fixed price agreement.

44.    In early 2017, WEC experienced cash shortfalls related to the Summer Project and a deepening liquidity crisis.  Although WEC sought additional emergency funding from its parent, Toshiba, in March 2017, Toshiba stated it could not provide it without collateral, including potentially through debtor-in-possession funding in a chapter 11 reorganization process, which WEC then initiated.

45.    On March 29, 2017, WEC and its subsidiaries filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the Southern District of New York.

46.     With its bankruptcy filing of March 29, 2017, the WEC debtors had the possibility of rejecting the fixed price provision of the contract.  To forestall the rejection decision, the parties entered into an Interim Assessment period in which SCANA would fund the operational costs of the Summer Project until alternatives for completing it could be developed.

47.     SCANA used the Interim Assessment period (which was extended until August 10, 2017) to determine if it were feasible for it to complete the project using an owner-directed model.

48.     Under that model, SCANA began to take complete control over the manufacture and construction of the Summer Project.

49.     SCANA operationalized the owner-directed model as of March 29, 2017 because, on information and belief, the Summer Project failed due to, in large measure deficiencies in the "client-contractor model" for construction that SCANA adopted in launching the Summer Project.

50.     Under the "client-contractor" model, there were two separate, parallel hierarchies of managers who attempted to direct the Summer Project construction.

51.     On the one hand SCANA had its own pyramidal workforce consisting of its general manager of nuclear construction atop dozens of its own employees reporting up to him who oversaw every facet of the on –site construction.

52.     On the other hand, WEC, the primary contractor together with its subsidiaries and its main subcontractor, Defendant Fluor, maintained a pyramidal hierarchy headed by a WEC product director and Fluor construction director, and hundreds of managers and thousands of craft level employees reporting up to them.  (The division of responsibilities between WEC and Fluor were set out in their own agreement).

53.    Given the independent hierarchies in that model, no entity or person filled the functional role of a Chief Executive Officer responsible for the whole project and to whom all lines of supervision reported.

54.    As a result of the separate structures, neither Fluor, WEC, or SCANA was ever fully in charge of the project.

55.    No entity was fully accountable for the cost under this structure.  SCANA could pass its responsibility to rate-payers under the BLRA and then it pass all future accountability to WEC under the fixed price contract.

56.    At the point of the bankruptcy, SCANA became financially accountable for the ongoing costs and plan of completion.  With WEC sidelined under bankruptcy court protection, SCANA recognized it needed to immediately take full charge of the project to make it appear viable.

57.    Until the petition was filed, WEC laid out the construction costs, with SCANA periodically reimbursing only a fraction of those amounts.  Now SCANA was responsible for paying the large payroll of thousands of craft employees.  Side-stepping WEC and the prior hierarchies, SCANA began paying Fluor's payroll directly to Fluor.

58.    As a result of becoming responsible for all the costs of completing the project, SCANA made clear it had veto power over any decision that might add cost or cause delay to the Summer Project, and began to exercise that prerogative.

59.    SCANA's assumption of control over construction at the site on a decision-by-decision basis was tied to its complete overhaul and restructuring of the "client" based model to the "owner-directed" model.  SCANA articulated this restructuring in open discussions with Fluor and WEC, and in writing.

60.    Upon the bankruptcy filing, SCANA became responsible for completing the unfinished ETC roadmap for the completion of the project.  SCANA redrafted the ETC to spell out the new single hierarchy in which it assumed complete control over all significant decisions made from the ground-level up on the construction site.

61.    SCANA, in the ETC, reassigned Fluor and WEC employees in a line of supervision interspersed with SCANA's own managers to whom Fluor and WEC employees would report at various levels.  SCANA created organization charts to reflect the structure.

62.    Not waiting for the ETC to be formally promulgated, SCANA began taking ownership of operational decision-making to give effect to the owner-directed model.

63.    Until the bankruptcy filing, SCANA's general manager and cadre of overseers, many of whom were subject matter specialists and had even worked for Fluor or WEC at the Summer Project, oversaw the work of Fluor and WEC.

64.    SCANA's ground-level overseers attended all significant construction events, such as crane lifts and major concrete placements, and they attended the continual meetings across the site that took place throughout the day between Fluor and WEC and their respective crews dealing with the operational nuts-and-bolts of the constructions tasks.

65.    Prior to the bankruptcy filing, SCANA's overseers normally kept silent at these events and meetings; instead, they made notes and sent messages up the SCANA reporting chain.

66.    These messages might then be discussed when SCANA's top project directors interfaced with their counterparts at Fluor and WEC at the daily Plan of the Day ("POD") meeting.  The POD meeting was held weekday mornings at 9 a.m. and lasted about an hour

67.     POD meetings were typically attended by SCANA's top operational officers: Alan Torres, SCANA's General Manager of Nuclear Construction at the VC Summer Unit 2 and 3, and/or Kyle Young, SCANA's Manager, Nuclear Plant Construction and /or Brian Merriman, SCANA's Project Manager/Engineer IV.  Attending from Fluor were Bruce Hinkley, Fluor's Construction Director and/or John Shepherd, Fluor's V.P. and Site Director, and from WEC were Carl D. Churchman, WEC's Consortium VP and Project Director for VC Summer 2/3 and/or Rod Cavalieri, WEC's Director of Project Management.

| SCANA | FLUOR | WEC |
|---|---|---|
| • Alan Torres, General Manager of Nuclear Construction at the VC Summer Unit 2 and 3. <br>• Kyle Young, Manager, Nuclear Plant Construction. <br>• Brian Merriman, Project Manager/ Engineer IV. | • Bruce Hinkley, Construction Director. <br>• John Shepherd, V.P. and Site Director. | • Carl D. Churchman, Consortium VP and Project Director for VC Summer 2/3. <br>• Rod Cavalieri, Director of Project Management. |

68.     The SCANA, Fluor and WEC leaders would typically attend the POD meetings along with nine or 10 of their second-tier managers so that the conference room would fill with about 30-40 people.  Plaintiff Lorentz attended many POD meetings with his WEC supervisors, Churchman and Cavalieri.

69.     The purpose of the POD meetings prior to the bankruptcy was for Fluor/WEC to inform SCANA of what they planned to do and to invite comments, consistent with client–contractor relationship.  The parties dialoged about any issues that had "bubbled up" from their respective phalanxes of managers in the field, consistent with Fluor/WEC's correction action processes and procedures.  It was understood that Fluor/WEC had control over the manner and means in which the construction work was done and over their own personnel.

70.     Prior to the bankruptcy, SCANA could, as client, flag discrepancies or mistakes such as a bad weld, and file a condition report seeking corrective action.

71.     Consistent with their own correction action processes and procedures, Fluor/WEC would address and resolve those issues.  It was understood that Fluor/WEC had control over the manner and means in which the construction was performed in the first instance.  While SCANA raised issues in its role as client, Fluor/WEC controlled the decision to take corrective actions.

72.     That changed after the bankruptcy filing.  SCANA became outspoken and forceful at the POD meetings.  For the first time, SCANA's input into day-to-day operations became proactive, intrusive, and decisional, in keeping with its assumption of CEO-type control and leadership.

73.     After the bankruptcy, SCANA field monitors, who had previously been silent, became vocal in directing Fluor/WEC personnel.  If a SCANA overseer expressed disagreement with how Fluor/WEC was performing a task, such as using a piece of equipment, SCANA overseers could and often would say so on the spot, and it was taken as a directive.

74.     Fluor/WEC personnel reasonably understood that the SCANA overseer's disagreement, if not complied with, would immediately upstream to SCANA's project director, Al Torres who would demand action from his Fluor or WEC counterparts, such as Carl Churchman or Bruce Hinkley, either at the next morning's POD meeting or in a call or message, who would then require compliance from the crew.

75.     After March 29, SCANA gave specific orders and directions concerning virtually all facets of the project, including construction, and safety - particularly concerning anything that would cause a delay or add cost.

76.    Prior to the bankruptcy filing, Fluor or WEC set the levels of craft personnel needed to perform assignments.  If more workers were needed in Fluor's or WEC's view, they had the authority to set headcount levels and engage in hiring.  After the bankruptcy, they lost that authority.  They had to requisition new hires from SCANA and obtain SCANA approval.

77.    Prior to the bankruptcy filing, WEC identified specialized jobs that required highly-skilled employees and had the right to hire that manpower of its own accord.  For example, WEC engaged about 120 specialists to work on the Nuclear Steam Supply System – the heart of the reactor's generator – by entering into a contract with Bechtel.   After the bankruptcy filing, SCANA, however, decided against it and terminated the agreement forcing WEC to let go the 120 individuals.

78.    SCANA's subordination of Fluor's and WEC's independence and autonomy in hiring and procurement was consistent with new ETC organization charts showing changes to the duties, titles, authority, and assignments of Fluor and WEC personnel.

79.    Under the ETC, Fluor was made construction manager reporting directly to SCANA, taking the place of WEC and its subsidiaries.

80.    After the bankruptcy, if Fluor or WEC needed several dozen employees, for example boilermakers, the decision, which they had once tightly-held, now had to be approved by SCANA.

81.    Upon information and belief, SCANA prevailed on Fluor to remove one of its managers over the construction site.  When Fluor sought to replace the person by hiring a WEC manager, Fluor had to, and did seek prior approval from SCANA.

82.    Taking control of operations after the bankruptcy, SCANA prospectively intervened in controlling the work.  If Fluor or WEC wished to perform a particular task, such as a major concrete placement on a Friday or Saturday, Al Torres might call them and tell them not to do so, and say he wanted it done on a different day, such as a Thursday or Monday, which they would then do.

83.    Prior to the bankruptcy, it was up to the Project Management Office maintained by WEC to approve all overtime.  WEC maintained final approval of overtime for the entire site. After the petition filing, SCANA took away that authority from WEC, and WEC and Fluor employees had to go directly to SCANA which decided when they worked overtime and for how many hours.  Thus, SCANA exercised control over their job schedules, duties and performance.

84.    SCANA's control over work schedules extended to policies for days off.  SCANA directed that the Memorial Day weekend would be treated as a three-day weekend, but that the following Saturday would be a work day – a type of decision formerly left to WEC.

85.    At all times, SCANA provided the facilities, equipment, tools and materials necessary to complete the work.  Although Fluor and WEC personnel manned the equipment room, the construction helmets, vests and other safety gear and protective clothing that were dispensed were paid for by SCANA.  Requisitions for the equipment were sent to and paid for by SCANA

86.    Heavy construction equipment, which was generally rented, was paid for by SCANA.

87.    The construction work took place on SCANA's premises where hundreds of SCANA's own employees worked.  Some operated the pre-existing nuclear reactor, V.C. Summer 1, but others were dedicated to the construction of reactors 2 and 3.  All of WEC's and Fluor's employees at the site were dedicated solely to the building of the Summer Project for the Owners.

88.    Besides micro-managing schedules and controlling the manner and means of discrete construction tasks after the bankruptcy filing, SCANA was rearranging the priorities for the project's critical path toward completion which formerly had been in the bailiwick of WEC/Fluor.  The effect was that SCANA obliterated the functional independence of the Fluor and WEC contractors and took control over the work and workforce.

89.    Although SCANA began implementing its owner-directed model after the bankruptcy, no one stepped forward to help fund it.

90.    On information and belief, under the EPC Agreement, Santee Cooper could not remove itself from the VC Summer project, however, until a designated point in time.  With the bankruptcy of Westinghouse and the Interim Assessment period expiring, however, that exit point was calendared.  As expected, when that point arrived in late July 2017, Santee Cooper took the opportunity to withdraw its 40 percent ownership from the project, which foreseeably doomed it.

91.    As SCANA recognized from at least March 2017, mass layoffs and shutdowns were almost inevitable at the Summer Project in mid-summer.  Out of the four options SCANA faced, the three most-likely scenarios demanded them.  While it may have been possible to find funding to replace WEC/Toshiba, and continue to build both Units 2 and 3, SCANA knew realistically that it was more probable that either: 1) only Unit 2 would go forward; or 2) Unit 3 would also go forward, but only after a long delay (requiring a shut down or layoff); or 3) neither would go forward (requiring a total shutdown).

92.    Given the greater probability of those options, SCANA and any responsible party aware of the circumstances would have recognized the need to provide notice 60 days prior to implementing those options.

93.    On July 31, 2017, SCANA sent a WARN Act notice to the South Carolina Department of Employment and Workforce that it "had decided to stop work on the construction of both Units."

94.    SCANA stated that its "complete termination of the construction project will affect 617 SCE&G employees," none of whom it chose to terminate at that point.

95.    On that day, SCE&G informed Fluor and Westinghouse of its decision to abandon the project.  SCE&G asked them to cease all work on the project immediately.  SCANA suddenly stopped paying the cost of employing over 5,000 employees on the site.

96.    In the four months leading to that day, the contractors obeyed SCANA's order to stop work and terminated the employees.  SCANA controlled the decision to terminate all the employees on the site without advance notice.

97.     SCANA had the ability to comply with the WARN Act by letting it be known 60 days prior to July 31, 2017 that unless the continuance of both reactors was deemed feasible at the end of the Interim Assessment period, a mass layoff would occur.  Alternatively, it could have postponed notice until the shutdown or mass layoff decision was made, and then provided 60 days' notice for terminations to take place after the orderly wind-down of the site was completed, to be paid for out of SCANA's wind-down budget.

98.     The day after the shutdown, SCE&G acknowledged at the August 1 ex parte briefing before the Public Service Commission of South Carolina, that its evaluation team "arrived at substantial completion dates for Unit 2 of December 31, 2022, and for Unit 3 of March 31, 2024 forecast the further cost of completion of the units of approximately $8.8 billion."

99.     At that briefing, SCE&G acknowledged it was responsible for the operational costs that its owner-directed model incurred: "when we learned that Westinghouse intended to reject our fixed-price contract, our first objective was to determine if it was feasible to complete the project using an owner-directed model and what it would cost for us to do so."

## WARN CLASS ALLEGATIONS

100.     Plaintiff Pennington brings the First Claim for Relief for violation of 29 U.S.C. § 2101 *et seq*., on behalf of himself and on behalf of a subclass all other similarly situated persons whose immediate employer was Fluor, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ. P. 23(a), who worked at, reported to, or received assignments from the VC Summer Facility and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs

18

and/or plant closings ordered by Defendants on or about July 31, 2017, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "Pennington Subclass").

101.    Plaintiff Lorentz brings the Claim for Relief for violation of 29 U.S.C. § 2101 *et seq.*, on behalf of himself and on behalf of a subclass all other similarly situated former persons whose immediate employer was WEC or its subsidiaries, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ. P. 23(a), who worked at, reported to, or received assignments from the VC Summer Facility and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by the SCANA Defendants on or about July 31, 2017, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "Lorentz Subclass," and together with the Pennington Subclass, the "WARN Class").

102.    The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of SCANA and/or Fluor.

103.    On information and belief, SCANA was a single employer of approximately 5,000 employees of Defendant Fluor and 600 employees of non-defendant WEC at the Facility.

104.    On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants SCANA and/or Fluor.

105.    On information and belief, the rate of pay and benefits that were being paid by Defendants SCANA and Fluor to each WARN Class Member at the time of his/her termination is contained in the books and records of the Defendants.

106.    Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)    whether the members of the WARN Class were employees of the Defendants who worked at, reported to, or received assignments from Defendants SCANA and Fluor in the case of the Pennington subclass, and Defendant SCANA and non-defendant WEC in the case of the Lorentz subclass;

(b)    whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)    whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

107.    The Plaintiffs' claims are typical of those of the WARN Class.  The Plaintiffs like other WARN Class members, worked at, reported to, or received assignments from the Defendants' Facility and were terminated without cause on or about July 31, 2017, due to the mass layoffs and/or plant closings ordered by SCANA.

108.    The claims of Plaintiffs Pennington and Lorentz are typical of claims of those of the respective Pennington Subclass and Lorentz Subclass.

109.    The Plaintiffs will fairly and adequately protect the interests of the WARN Class. The Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

110.    On or about July 31, 2017, Defendants terminated the Plaintiff Pennington's employment as part of a mass layoff or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which he was entitled to receive 60 days advance written notice under the WARN Act.

111.    On or about July 31, 2017, Defendant SCANA along with WEC terminated the Plaintiff Lorentz's employment as part of a mass layoff or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which he was entitled to receive 60 days advance written notice under the WARN Act.

112.    Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly because this is a WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

113.    Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties, and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

114.    The Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

## CLAIMS FOR RELIEF

### Violation of the WARN Act, 29 U.S.C. § 2104

115.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

116.    At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime.

117.    At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639.3(a)(1) and (2) at the VC Summer Facility.

118.    At all relevant times, Defendants SCANA and Fluor, on the one hand, and SCANA and WEC, on the other hand, were a "single employer."  20 C.F.R. § 639.3(a)(2) with respect to the employees who worked at the VC Summer Facility.

119.    On or about July 31, 2017, Defendants ordered mass layoffs and/or plant closings at the Facility, as those terms are defined by 29 U.S.C. § 2101(a)(2).

120.    The mass layoffs or plant closings at the Facility resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well as thirty-three percent (33%) of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

121.    The Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants SCANA and Fluor, or SCANA and non-defendant WEC, at the VC Summer Facility.

122.    The Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

123.    Defendants were required by the WARN Act to give the Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

124.    Defendants failed to give the Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

125.    The Plaintiffs and each of the Class Members, are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

126.    Defendants failed to pay the Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to make the pension and 401(k) contributions and provide employee benefits under COBRA for 60 days from and after the dates of their respective terminations.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, individually and on behalf of all other similarly situated persons, pray for the following relief as against Defendants, jointly and severally:

A.    Certification of this action as a class action;

B.    Designation of Plaintiffs as Class Representatives of their respective subclasses;

C.    Appointment of the undersigned attorneys as Class Counsel;

D.    A judgment in favor of the Plaintiffs and the other similarly situated former employees equal to the sum of: their unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other COBRA benefits, for 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period, all determined in accordance with the WARN Act, 29 U.S.C. § 2104(a)(1)(A);

E.    Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act; and

F.    Such other and further relief as this Court may deem just and proper.

DATED:  October 25, 2017

Respectfully submitted,

By:  ___ s/ Lucy C. Sanders_____
Lucy C. Sanders, Esq.
**BLOODGOOD & SANDERS, LLC**
242 Mathis Ferry Road, Suite 201
Mt. Pleasant, South Carolina 29464
Telephone: (843) 972-0313

___ s/ Jack A. Raisner_____
Jack A. Raisner, Esq.
René S. Roupinian, Esq.
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY  10017
Telephone: (212) 245-1000

*Attorneys for Plaintiffs and the putative class*